311 Ga. 313
FINAL COPY

S21A0162.  TRUETT v. THE STATE.

BOGGS, Justice.

Christopher Everett Truett was convicted of malice murder and related crimes arising out of the beating death of his girlfriend's two-year-old son, Wyatt Pruitt. He appeals, asserting as his sole enumeration of error the trial court's exclusion of certain character evidence. For the reasons stated below, we affirm.[1]

---

[1] The murder occurred on February 25, 2014. On September 15, 2014, a Forsyth County grand jury indicted Truett for malice murder, felony murder, aggravated battery, and cruelty to children in the first degree. Truett was tried before a jury from August 20 to 28, 2015, and found guilty of all charges. On August 28, 2015, Truett was sentenced to serve life in prison without the possibility of parole for malice murder, and 20 years to serve concurrently on the cruelty to children charge. The trial court merged the aggravated battery count into the malice murder conviction, and the felony murder conviction was vacated by operation of law. On August 31, 2015, Truett's trial counsel filed a timely motion for new trial, which was amended by appellate counsel on December 2 and December 13, 2019. After a hearing, the motion for new trial was denied on March 6, 2020. Truett's notice of appeal was filed on March 30, 2020, and the case was docketed in this Court to the term beginning in December 2020 and submitted for a decision on the briefs.

1. The evidence at trial[2] showed that on February 23, 2014, Truett and the victim's mother, Dawn Shutts, had been in a romantic relationship for several weeks, and he had moved in with her and her two children. Wyatt, the younger child, was feeling ill and was "up and down all night." On February 24, Truett told Shutts that one of the family dogs had pushed Wyatt down the stairs. He had a bruise over his eye but otherwise appeared fine, and Shutts did not think much of it. As she left for work on February 25, she noticed scratches on Wyatt's eyes and made a doctor's appointment for him. Wyatt was crying and screaming and did not want Shutts to leave. Truett was the only person with Wyatt that day.

During the morning, Shutts received several text messages from Truett: that his feelings were hurt because Wyatt did not like him, that Wyatt was "tripping hard," having temper tantrums, harming himself, and that he had wet and soiled himself. Shutts

---

[2] This Court no longer routinely considers sua sponte the sufficiency of the evidence in non-death penalty cases. See *Davenport v. State*, 309 Ga. 385, 392 (4) (846 SE2d 83) (2020). But a review of the evidence here is relevant to Truett's enumeration of error.

responded to the messages and told Truett to give Wyatt a bath. Later, Truett sent still more messages: that Wyatt had fallen in the tub and hurt himself and that a dog had pushed him down again. Truett added, "Get home. Something's wrong." A few minutes later Truett sent another message, "Get home now, baby." Shutts returned home to find Wyatt lying on the sofa, unresponsive. He was "cold and stiff," blood was coming out of his mouth, and he had bruises all over his face and body that were not there earlier that morning. Shutts exclaimed to Truett, "What did you do to my kid?" Truett responded that Wyatt was still breathing, but Shutts saw that Wyatt was not breathing and told Truett to call 911. Truett "hesitated," but then called and handed the phone to Shutts. The 911 dispatcher instructed her on how to perform CPR, and she continued until the police arrived. When she looked up, Truett had disappeared.

A sheriff's deputy took over CPR until paramedics arrived. He observed that Wyatt's face appeared "battered." A paramedic who arrived a few minutes later testified that Wyatt appeared to be dead,

but he and other paramedics still attempted to revive him. They transported Wyatt to the hospital, where an ER physician continued attempts to revive him, although he testified that Wyatt was in "complete cardiac standstill" and rigor mortis had already set in. The physician testified that, based on the state of the rigor mortis and lividity in the child's body, he had been dead for over an hour when he arrived at the hospital, approximately one-half hour after the 911 call was placed. He also testified that Wyatt had numerous bruises, scratches, and ruptured blood vessels in his face, as well as bruises on his ears, extremities, and abdomen. He testified that the abdominal injuries indicated bleeding from the liver, which required a "high-energy force." He concluded that Wyatt's injuries were "completely inconsistent" with a fall down the stairs and that the injuries were not caused by CPR.

A medical examiner and Director of Pediatric Forensic Medicine for the Georgia Bureau of Investigation, who was qualified without objection at trial as an expert in the field of pediatric and forensic pathology, performed an autopsy on Wyatt's body. She

4

testified that Wyatt had suffered severe, multiple, wide-ranging injuries due to beating, squeezing, twisting, and strangulation. She observed extensive bleeding in the tissues of the head and bruises and abrasions on his head, face, lips, and ears. She also observed ruptured blood vessels in his face and marks on his mouth, jaw, and neck that in her opinion were due to compression of the neck, indicating an asphyxiation or strangulation event. Bilateral bruises on the side of his head indicated that his head had been squeezed, and his brain was markedly swollen. She also observed internal bleeding in his genitalia, indicative of a twisting or squeezing injury. In his abdomen, consistent with significant external bruising, she observed extensive bleeding, primarily due to an eight-centimeter laceration to his liver that she described as "huge" and "severe"; this was the immediate cause of Wyatt's death through loss of blood. About 20 percent of Wyatt's blood supply was pooled in the abdomen. She also observed injuries to his diaphragm, right lung, pancreas, and soft tissues of the abdomen. She concluded that the cause of death was multiple blunt force injuries to the abdomen, such as

5

punching or kicking, with blunt impact injuries to the head as a contributing factor. In the medical examiner's opinion, the injuries were inflicted deliberately and were not due to falling down stairs, CPR efforts, or medical intervention.[3]

In light of the severity of Wyatt's injuries and Truett's sudden disappearance, the police immediately "pinged" Truett's cell phone number; the last location of the phone was in an overgrown, swampy area behind the subdivision where Shutts lived. Officers set up a perimeter around the area and began searching; Truett was spotted "low crawling" in a creek bed, headed away from the subdivision. Officers shouted for him to come out, but he continued to elude them in the heavy underbrush and swamp until a K-9 officer brought in an apprehension dog and announced that he was about to release

---

[3] Former medical examiner Dr. Joseph Burton testified for the defense that in his opinion Wyatt's injuries could have been caused by a fall down the stairs or by efforts at CPR, and that the liver laceration "could. I'm not saying it would" have occurred up to 24 hours earlier and been exacerbated, but not caused, by CPR, although he acknowledged that CPR could not have contributed to Wyatt's death if he was already in rigor mortis when the first deputy arrived. Dr. Burton acknowledged, moreover, that he could not explain all of Wyatt's injuries and stated, "I'm not telling the jury or the Court that [his injuries] were caused by that fall. I'm just saying that the fall could cause the injuries that I saw."

the dog and "that she will bite." Truett then stood up and surrendered. After he was arrested, the police discovered that at some point he had removed the battery from his cell phone, rendering the phone untraceable. During Truett's police interview, he gave inconsistent accounts of how the injuries to Wyatt occurred. When a police sergeant remarked that Truett appeared to have skin under his fingernails, Truett immediately began "picking" at his hands and then attempted to urinate on his hands when he was escorted to the restroom. Wyatt's DNA was recovered from under one of Truett's fingernails.

At trial, Truett testified and denied having harmed Wyatt. He testified that he was a "great father" to his own four-year-old daughter and that she stayed with him frequently. He presented seven character witnesses who testified to Truett's reputation for positive conduct with children and for peacefulness. Truett further testified that he ran away from Shutts' home because he was frightened when Shutts asked him, "What did you do to my kid?" He acknowledged smoking marijuana on the day of Wyatt's death and

the day before, and that he was "aggravated" with Shutts and wanted to go home "the whole time."

2. In his sole enumeration of error, Truett contends that a new trial is required because the court erroneously prevented him from asking his character witnesses "if they would be comfortable with him around their children" or about specific instances of good character. [4]

The relevant section of the Evidence Code is OCGA § 24-4-405, which provides in its entirety:

> (a) In all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion.
> (b) In proceedings in which character or a trait of character of a person is an essential element of a charge, claim, or defense *or when an accused testifies to his or her own character*, proof may also be made of specific instances of that person's conduct. The character of the accused, including specific instances of the accused's conduct, shall also be admissible in a presentencing

---

[4] In his brief here, Truett repeatedly asserts that the trial court erroneously applied Georgia's former Evidence Code in ruling on this matter. It is clear from the transcripts of the hearing and the trial, however, that the parties and the trial court relied upon the current Evidence Code, as well as commentary and treatises discussing it.

hearing subject to the provisions of Code Section 17-10-2.
  (c) On cross-examination, inquiry shall be allowable
into relevant specific instances of conduct.

(Emphasis supplied.)[5] See generally *Strong v. State*, 309 Ga. 295, 313-314 (3) (845 SE2d 653) (2020) (discussing application of OCGA §§ 24-4-404 (a) and 24-4-405 (b)).

The trial court held a pretrial hearing on August 17, 2015. The same day, the State and Truett filed numerous motions addressing evidentiary issues. Among Truett's motions was a "Motion for Pre-Trial Ruling" in which he asked the trial court to allow character witnesses for the defense to testify under OCGA § 24-4-405 (a) to "the defendant's reputation, demeanor and attitude toward and around children" and to their "opinion as to defendant's character including specific, pertinent character traits exhibited by defendant within the context of the charges against him." During the argument on this motion, the court and the parties discussed OCGA § 24-4-405

---

[5] The italicized portions of the Georgia rule, among other provisions, do not appear in the corresponding Federal Rule of Evidence 405.
   .

9

(a) at some length, but subsection (b) and the exception regarding a testifying defendant were never mentioned; Truett did not raise that provision of the Evidence Code, nor was there any indication from Truett at that time that he planned to testify.[6]

The court ruled that Truett could ask the character witnesses if Truett was "a good father. He's good around children. That would be basically the extent. You just can't get into specific acts of good character. You can't let the witness go on and on about, well, I've observed him, you know, the kids." At the hearing, Truett also sought leave to ask the character witnesses whether they "would trust him with their child." The trial court ruled out that testimony as going beyond a pertinent character trait, although it observed that it was implied in the permissible testimony.

At trial, after Truett had testified and his first character witness had taken the stand, the permissible scope of the character witnesses' testimony was discussed again, and defense counsel

---

[6] While the provisions of OCGA § 24-4-405 (b) were discussed at other points in the hearing, those discussions concerned other pretrial motions by either the State or Truett.

asked for "clarification" of the original ruling. Truett asked to question the witnesses regarding Truett's "reputation for peacefulness," and the trial court stated it would allow that line of questioning. Once more, however, Truett did not raise the specific provisions of OCGA § 24-4-405 (b), and there was no discussion of that subsection with respect to his character witnesses' testimony.

In Truett's motion for new trial, he argued that the trial court erred in refusing to permit him to ask if the witnesses "would be comfortable with him around their children" or about specific instances of good character. He attached affidavits from four of his trial witnesses providing specific examples of his behavior around their children and of his peaceful character. The trial court denied Truett's motion for new trial on this ground, finding that any error in excluding the disputed evidence was harmless. We agree, both because the proffered testimony would have been cumulative and because the evidence of Truett's guilt was very strong.

> In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so. The test

11

for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.

(Citations and punctuation omitted.) *Williams v. State*, 302 Ga. 147, 153-154 (3) (805 SE2d 873) (2017); see also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . .").

Here, the jury heard testimony from seven character witnesses, and, despite the trial court's earlier ruling, most of them testified to numerous specific examples of Truett's conduct with children, including Wyatt and his brother as well as the witnesses' own children or grandchildren. Tonya Watkins testified that she had left Truett with her own children and had "never seen any kind of issue as far as that's concerned." Patti Seiber testified that Truett had interacted with her granddaughter. Jessica Rainwater testified that she witnessed Truett being "attentive" to the children at a family gathering, in particular to Wyatt after Shutts put him into a car and then ignored the child while walking around talking on her

phone. Rainwater also testified that Truett had watched her daughter. Paul Walls testified that he observed Truett playing, laughing, and joking with Shutts' children "about the same as with my own kids," and keeping them from getting into trouble in a neighbor's yard when Shutts did not intervene. Walls further testified that Truett had watched his children as well. Susan Truett, Truett's mother, testified that Truett's interactions with Wyatt were "normal" and that he had taken the initiative to get both Wyatt and his older brother away from some "aggressive" dogs when their mother did not do so. She also testified that she received a text message from Shutts with two photos of Truett and Wyatt "asleep on the couch, like a father and son." The evidence presented by the witnesses on Truett's motion for new trial therefore was largely cumulative of their trial testimony, merely elaborating on their earlier accounts of Truett's positive conduct with children and peacefulness and giving additional specific instances of his conduct.

Moreover, the evidence of Truett's guilt was very strong. As noted above, Wyatt suffered multiple severe injuries to many parts

of his body, including internal organs, inflicted by a variety of methods including multiple blunt force trauma. Truett's expert witness conceded that he could not explain all of Wyatt's injuries as possibly due to a fall or medical intervention. Truett was the only adult present in the home when Wyatt died, he did not seek medical aid for Wyatt despite his obvious severe injuries, and he was reluctant to call 911 even after Shutts arrived. He then fled the scene, disabled his cell phone, and attempted to elude the police. He also gave conflicting accounts of how Wyatt's injuries occurred and made repeated attempts to remove potential evidence from his hands.

Any error by the trial court in limiting the witnesses' testimony therefore was harmless, as it is highly probable that any such error did not contribute to the verdicts. See *Henderson v. State*, 310 Ga. 708, 714 (3) (854 SE2d 523) (2021) (exclusion of victim's statement that he had been to prison, to the extent it constituted a threat, was harmless both because cumulative of other testimony that victim explicitly threatened appellant and because evidence of appellant's

14

guilt was "very strong"); *Keller v. State*, 308 Ga. 492, 503 (5) (842 SE2d 22) (2020) ("[I]n light of the strong evidence of [appellant's] guilt," refusal to allow appellant's witness to testify was "harmless error, if error at all," because it was highly probable that exclusion of evidence did not contribute to verdict); *Mitchell v. State*, 293 Ga. 1, 3 (2) (742 SE2d 454) (2013) (exclusion of portions of appellant's recorded statement harmless when similar evidence admitted through another witness).

*Judgment affirmed. All the Justices concur.*

Decided April 19, 2021.

Murder. Forsyth Superior Court. Before Judge Bagley.

*Clark & Towne, Jessica R. Towne*, for appellant.

*Penny A. Penn, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.