312 Ga. 299
FINAL COPY

S21A0568.  COOK v. THE STATE.

WARREN, Justice.

Charles Cook was tried by a Fulton County jury and convicted

of malice murder and other crimes in connection with the shooting

death of Salanto Winfrey.  On appeal, Cook contends that the trial

court erred when it precluded him from presenting evidence of

Winfrey's prior violent acts toward third parties.  Seeing no

reversible error, we affirm.[1]

---

[1] Winfrey was killed on November 2, 2012.  On March 15, 2013, a Fulton County grand jury indicted Cook, charging him with malice murder, felony murder predicated on aggravated assault, felony murder predicated on possession of a firearm by a convicted felon, aggravated assault with a deadly weapon, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony.  Cook was tried in June 2014, and a jury found him guilty of all counts.  The trial court sentenced Cook to life in prison for malice murder and a consecutive five years in prison for possession of a firearm during the commission of a felony.  The remaining counts were merged or vacated by operation of law.  Cook was sentenced under the recidivist provisions of OCGA § 17-10-7 (a) and (c), and the trial court noted that Cook's sentence under those provisions "[in] effect" was life without parole.  Cook filed a timely motion for new trial on June 26, 2014, and amended it through new counsel on June 28, 2019.  After a hearing, the trial court denied

1. As relevant to this appeal, the evidence presented at trial showed the following. Cook and Winfrey lived in separate apartments in a four-unit residential building. On the evening of November 2, 2012, the landlord visited the tenants of the building, and as he was talking to Cook in Cook's apartment, Winfrey called Cook outside. The landlord testified that, when Cook went outside, Winfrey "started getting loud." The landlord also came outside and heard Winfrey tell Cook to "mind your own business and pay your rent." When Cook started to walk back to his apartment, Winfrey said, "It's not going to happen the way it happened before." Cook asked Winfrey to repeat himself, then went inside his own apartment and came out with a gun.

At that point, Winfrey was sitting on the porch with his back to the building. The landlord testified that when Cook came out with the gun, he had a "glassy-eyed" look and was "staring, just staring. He[ ] wasn't staring at anything or anybody." Cook then fired a shot

the motion on October 2, 2019. Cook filed a timely notice of appeal, and this case was docketed in this Court to the April 2021 term and submitted for a decision on the briefs.

2

at Winfrey, came down the steps, stood in front of Winfrey, and made some "taunting" statements, "something like what you got to say now, big boy?" Cook then shot Winfrey again, ran up the steps, came back down, and shot Winfrey a third time, after which Cook disappeared into his apartment. The landlord testified that he did not see Winfrey with a weapon, did not hear him say anything "to the effect that he was going to merk" Cook,[2] and did not see him make any gestures toward Cook as if to attack him.

Another account of the shooting came from a witness who had worked for Winfrey as a driver. Around the time of the shooting, the driver saw Winfrey go into Cook's apartment and heard people arguing inside. Winfrey then came outside and sat with his back turned to Cook's apartment. Cook exited the apartment and said, "Okay, you said you are going to merk me." Cook then went back inside the apartment, came out with a pistol, fired at Winfrey's head, stepped down two steps, and shot Winfrey again at point-blank

---

[2] A witness testified that the word "merk," in "certain neighborhoods in the area," meant "I'm going to kill you or hurt you or do something to you."

range. Winfrey fell to the ground, but Cook went further down the stairs, stood over Winfrey, and fired again. After the shooting, Cook went back inside his apartment. The driver testified that he did not see anyone with a gun other than Cook, and he identified Cook in court as the shooter.

Additional evidence presented at trial showed that when police officers arrived at the scene, they did not locate any weapons and did not receive any information from witnesses about Winfrey having a weapon. Within hours of the shooting, Cook was identified as a suspect and a warrant was issued for his arrest. Cook had fled the scene, however, and was not apprehended until December 17, 2012. An autopsy revealed that Winfrey suffered two fatal gunshot wounds to his back and one gunshot wound to the back of his thigh.

In addition to the evidence noted above, the State presented evidence of an earlier confrontation between Cook and Winfrey about a parking space. Cook's cousin, Adrian Cook, testified that, about three or four months before the shooting, he was in his apartment when he was alerted to a fight between Cook and

4

Winfrey, where Winfrey was "jumping on [Cook]." When Adrian came outside, Winfrey was standing on the porch "cussing [and] saying different stuff about what he was going to do. He was going to do this, do that." The back of Cook's head was "busted and it was bleeding real bad." Upon seeing Adrian, Winfrey walked upstairs, retrieved a pistol, and came back downstairs, but then the landlord arrived, and the situation deescalated. Asked about Winfrey's general behavior and reputation, Adrian testified that Winfrey was a "pretty big guy," had a "bully mentality," and was "hustling dealing with guns and different other things." Adrian had seen Winfrey with a gun on multiple occasions and even talked with Cook about moving out of the building due to Winfrey's behavior.

Cook's primary defense strategy was to show that he shot Winfrey in self-defense or that, at most, the shooting amounted to voluntary manslaughter — a lesser offense of murder. To that end, Cook presented the testimony of Edgar Rivera, who lived across the street from the building and observed the shooting. Rivera testified that, on the evening of the shooting, Winfrey started arguing with

5

Cook and told Cook "that he was going to have him killed." Winfrey then "went upstairs to where he lived and . . . got a gun and had it in his hood[ie]." Rivera testified:

> So I can hear them arguing and, you know, [Winfrey] kept telling [Cook] that you know he was going to have him killed or whatever. And [Cook] kept telling him to just chill out, you know, just let it go or whatever but for some reason he just wouldn't walk away. So [Winfrey] kept his hands tucked in his hood[ie] the whole tim[e].

"And the next thing I know," Rivera said, "I just seen [Winfrey] kind of he jerked back trying to pull his hand out of his hood[ie] and that's when the shooting started."

The defense also presented testimony about the parking-space confrontation Adrian had described. One of the defense witnesses testified that he recalled Winfrey "throwing [Cook] down and beating him up throwing him into a table and whatnot," resulting in a "big ole bruise" to the back of Cook's head. That witness also recalled Winfrey telling Cook that "it ain't over" and that if he saw Cook's car parked in the space again, Winfrey "was going to do this and he was going to do that and you know." Another witness

6

testified that Winfrey told Cook to move his car "out of the driveway," challenged Cook to a fight, and "swung at" Cook, causing Cook to hit his head against a brick wall.

Several defense witnesses also testified about Winfrey's reputation for violence. One witness said that Winfrey "would use his size to try to intimidate people." Another testified that Winfrey "used to talk to people real bad . . . in a real like vicious way about things that was going on around," that Winfrey got "into a lot of fights with a lot of other people," and that he "most definitely" had a reputation for carrying a gun. And a third testified that Winfrey "was violent," would "put his hands on you," and had a reputation for carrying a gun.

2. In his sole enumeration of error, Cook contends that the trial court erred when it denied his request to present evidence of three separate instances of violence committed by Winfrey against third parties, namely, an incident where Winfrey slapped an elderly man and threw him over a banister, an incident where Winfrey struck "an older man" in the back with a rake, and an incident where

Winfrey "punch[ed] a man in the face so hard that he did a backwards flip/fall off the porch." This enumeration of error fails.

Pretermitting whether the trial court erred when it excluded the proffered evidence, we conclude that any such error was harmless and presents no grounds for reversal. See *Neuman v. State*, 311 Ga. 83, 91 (856 SE2d 289) (2021) ("[E]ven where an abuse of discretion is shown, there are no grounds for reversal if the error did not affect a substantial right, and thus harm, the defendant.") (citation and punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Truett v. State*, 311 Ga. 313, 318 (857 SE2d 690) (2021) (citation and punctuation omitted).

Here, the main import of the excluded evidence was to show that Cook had reason to fear Winfrey and to believe that Winfrey would try to kill or hurt him. But the jury had already heard

8

abundant evidence supporting that aspect of Cook's defense theory. Testimony from multiple witnesses showed that Winfrey had a reputation for being violent and aggressive, that he was known to carry a gun, that he previously physically assaulted Cook because of a disagreement about a parking space, and that he had threatened to kill Cook. In light of the specific evidence already presented in this case, the additional evidence Cook sought to admit about Winfrey acting violently toward third parties was essentially cumulative, and it is highly unlikely that such additional evidence would have had any effect on the verdict. See *Peterson v. State*, 274 Ga. 165, 168 (549 SE2d 387) (2001) ("In light of the substantial evidence of [victim]'s violent acts, it is highly probable that any additional evidence of prior violent acts would not affect the verdict, and any erroneous exclusion of that evidence was harmless."); *Sturkey v. State*, 271 Ga. 572, 574 (522 SE2d 463) (1999) (error in excluding testimony that victim had threatened the defendant was harmless because the jury heard "ample other evidence that [victim] was a violent person who had threatened the defendant"). See also

9

*Henderson v. State*, 310 Ga. 708, 714 (854 SE2d 523) (2021) (exclusion of defendant's testimony about a victim's threat was harmless, in part because that testimony "added little if anything" to defendant's other testimony about "more explicit threats").

*Judgment affirmed. All the Justices concur.*

Decided August 24, 2021.

Murder. Fulton Superior Court. Before Judge Millender.

*Juwayn Haddad*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.