NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 29, 2024

S24A0521. TARVER v. STATE.

MCMILLIAN, Justice.

Ricquavious Tarver was convicted of murder and other crimes in connection with the shooting death of Roosevelt Demmons.[1] Tarver argues on appeal that (1) the trial court erred in excluding evidence of Tarver's knowledge of Demmons's previous acts of

---

[1] Demmons was killed on August 27, 2016, and Tarver was charged by special presentment in McDuffie County in June 2017 for malice murder (Count 1), felony murder predicated upon aggravated assault (Count 2), aggravated assault with a deadly weapon (Count 3), and possession of a firearm during the commission of a felony (Count 4). He was tried before a jury in September 2018 and found guilty on all counts. The trial court sentenced Tarver to serve life in prison with the possibility of parole on Count 1, and five years in prison to be served consecutively on Count 4. Count 2 was vacated by operation of law and Count 3 was merged into Count 1. Tarver filed a timely motion for new trial on October 2, 2018, which was amended by new counsel on July 31, 2019, and amended a second time by current counsel on March 24, 2021. Following a hearing on June 28, 2021, the trial court denied the motion as amended on November 27, 2023. Tarver filed a timely notice of appeal, and the case was docketed to the April 2024 term of this Court. The Court heard oral argument on the case on April 18, 2024.

violence to support his claim of self-defense and (2) the trial court erred in excluding, on the grounds of hearsay, the video-recorded interview of Tarver by police because the interview was not being admitted for the truth of the matter asserted and should have been admitted to show how cooperative Tarver was after the shooting. For the reasons set forth below, we affirm.

1. The evidence presented at trial showed[2] that Alton Tucker owned a car wash business in Thomson in a former garage, and on August 27, 2016, Tarver went there to wash his car. Tucker had known Tarver and Tarver's father, a police officer, for a long time and considered them to be like family. Tucker's 13-year-old son, Shamar, was also at the car wash that day. Shamar and Tarver left the car wash together to go to a store and then to Tarver's parents' house. After they left, Demmons came to the car wash to collect money from Tucker for a set of tire rims Demmons was selling.

---

[2] Because this case involves an analysis of whether errors in excluding evidence were harmless, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done instead of viewing it in the light most favorable to the jury's verdict." *Jivens v. State*, 317 Ga. 859, 863 (2) (896 SE2d 516) (2023).

2

Tucker asked Demmons to wait because he was in the process of washing a car for a customer, Cedric Williams. **W**illiams knew Demmons and asked if he wanted to walk to a nearby gas station to get something to drink while they were waiting, and Demmons agreed.

At some point, Tarver drove back by the car wash and saw Demmons's truck parked there. He then called Tucker and told him that Demmons was the man he "got into it with a few months back" and asked if he could come to the car wash to talk to Demmons "to get this over with." At trial, Tarver, who testified in his own defense, explained that a few months earlier, in May or early June 2016, Tarver and Demmons had a confrontation at an apartment complex as they both sat in their vehicles with their windows open. Demmons yelled, so that everyone around could hear, that Tarver was "a police[, a n****r] and you just like your daddy." Demmons accused Tarver of calling the police and getting Demmons "locked up" in connection with a prior incident. When Tarver told Demmons that he had no idea what Demmons was talking about, Demmons replied,

3

"I tell you what, just don't speak my name no more, just don't talk my name no more, the next time you speak my name I'm coming to see about you." Tarver testified that he had never had trouble with Demmons before, and he had no further contact with Demmons between that incident and August 27. However, based on Demmons's statement, Tarver thought that Demmons wanted "to try to beat [him] up," "to hurt [him]," or to "cause [him] harm."

Tarver further testified that he applied for a permit to carry a weapon on July 7, 2016, which he received on July 25, and that he purchased a ".45 1911A Rock Island firearm" at some point between his receipt of the permit and August 27. However, Tarver said that there was nothing about the words Demmons used in the prior incident that made him feel threatened enough to get his gun permit; rather, he obtained the gun for his own protection and not because of Demmons.

When Tarver arrived back at the car wash with Shamar on August 27, Demmons and Williams had not yet returned from the gas station. Tucker asked Tarver if everything was going to be all

right with Demmons, and Tarver responded, "yeah, I'm good." Tucker asked this question because Tarver had shown Tucker his gun permit earlier in the day, and Tucker sought assurance from Tarver that he was not carrying a weapon and was just intending to talk to Demmons. Tarver testified at trial that he only wanted "to make peace" with Demmons. However, he admitted that every time he went anywhere, he "always tote[d]" his gun on his side, and, even though Tarver usually carried his gun and ammunition separately, that day, he put the ammunition clip in his gun when he got to the car wash because he "knew [Demmons] was already there."

Williams testified that as soon as he and Demmons got back to the car wash from the gas station, Tarver came up to Demmons, and when Tarver got close enough, "they went to arguing." Tucker testified that he was washing Williams's car when Williams and Demmons returned, and he did not pay much attention to what Tarver and Demmons were saying. Both men were standing in one of the two open garage bay doors within ten feet from where Tucker was working, and Tucker overheard Demmons tell Tarver "to find

5

somebody to play with or I'll give you something you don't want." Tucker told police at the time of the incident that he also heard Demmons tell Tarver, "Oh, I think I'm going to lay you out" and something to the effect of "get out of my face." Williams testified that he was sitting in the other garage bay, about 15 feet away from Tarver and Demmons. He heard Demmons say, "I know what you did" and "don't make me whoop your a** out here with these shower shoes on," after which Demmons turned and walked away.

Both Williams and Tucker testified that Demmons was walking toward the back of the garage, and away from Tarver, when they heard the first gunshot. They then observed Tarver walk toward Demmons, who fell to the ground. After Demmons fell, Tarver, as he later admitted, pointed the gun down at him and kept shooting until he had emptied his clip of eight .45 caliber bullets. Demmons was unarmed, and the only gun Williams or Tucker saw that day was Tarver's. No evidence was presented that any physical interaction occurred between Tarver and Demmons before the shooting began, and Tarver admitted that Demmons never punched,

6

pushed, or even touched him.

After the shooting, Tucker and Tarver walked out of the garage, and Tarver put his arm around Tucker, saying that it was not Tucker's fault, that it was "something [Tarver] wanted to do." **«V3-80»** Tucker testified that he called the police and that Tarver called his mother and told her, "Mama, I just killed me a MF." Tarver stayed at the scene and put his gun in the glove box of his car.

When police and EMS arrived, Demmons, who was lying face down on the garage floor, was not breathing and had no pulse. Tarver had his hands in the air and kept them there until officers ordered him to the ground and handcuffed him. Tarver was cooperative with police, following their instructions and telling them that the gun he used to shoot Demmons could be found in his car. Police patted Tarver down and the officer who escorted Tarver to a waiting police car testified that Tarver repeatedly volunteered that he knew he was wrong for what he had done, and he should have

7

walked away.[3] The officer said that Tarver also voluntarily spoke to police at the police station, saying that Demmons had tried to fight him before and that Demmons was again trying to fight him that day, so Tarver "did what he had to do," but he knew it was a mistake.

During the autopsy, the medical examiner identified ten gunshot wounds on Tucker's body, some of which were caused by the same bullet. Only one of the wounds was found on the front of Demmons's body. The medical examiner described this wound as a "complex wound," which she testified consisted of "an entrance, an exit, a reentrance, and a re-exit," meaning that "the bullet went in, out, in, out." The cause of death was attributed to multiple gunshot wounds.

A GBI crime scene specialist testified that he found flattened bullets at the scene and in Demmons's clothing, suggesting that they had passed through Demmons's body and struck the concrete floor,

---

[3] Tarver testified that he told the officer. "I know I was wrong, but I have the right to defend myself.  And I said: it wasn't supposed to happen like that, I was just trying to talk to him." He also testified that, at the jail, he just kept repeating, "I wish it would've never happened like that, I wish it would've never happened like that."

which supported that Demmons had been lying down when those shots were fired. He also found two bullets in the parking lot and the rest inside the garage.

In addition, Tarver testified that although Demmons never physically touched him, Demmons "got very aggressive" when they talked that day at the car wash. Demmons called Tarver "a rat" and asked why Tarver was there after he had "already snitched on [Demmons] one time." When Tarver denied these accusations, Demmons asked Tarver, "what you coming up here for, to try me or something, you know I'm chain gang bound." Tarver said he took that statement to mean that Demmons had intentions of hurting Tarver and that because Demmons had already been to prison, he did not care what the consequences would be if he were to hurt Tarver. Demmons also told Tarver that he did not need a pistol to fight him; Demmons said he "could beat [Tarver] with these slippers on." Tarver testified that he believed that Demmons knew Tarver was "at a disadvantage" because Tarver was disabled from a work accident, which had severely injured his left knee so that he could

9

not bend it and reduced the strength in both of his legs.

According to Tarver, after making these statements, Demmons balled up his fists and turned sideways into a "fight stance," asking Tarver if he was "ready." Tarver said that Demmons was walking toward him, so Tarver pulled out his gun to stop Demmons. Tarver testified that when he did that, Demmons said, "you got to use it," which Tarver interpreted to mean that if he did not use the gun, Demmons would get the gun from Tarver and use it on him. Demmons outweighed Tarver by almost 100 pounds although they were about the same height, and Tarver testified that when Demmons turned sideways and "came at [him]," Tarver felt threatened and was "fighting for [his] life." He then took two steps back and shot Demmons. Tarver said he shot Demmons eight times because he was taught in a firearm defense course not to quit shooting until he knew the person he was shooting was down. Tarver further testified that after the shooting, he called his mother to tell

her he had shot someone and also called 911.[4]

However, Tarver admitted on cross-examination that after he confronted Demmons at the car wash, Demmons said he did not want to talk about the prior incident, and it was Tarver who insisted on carrying the conversation further. And when Tarver persisted, Demmons told Tarver to "get out of [his] face."

2. Tarver first asserts that because self-defense was an issue in the case and the jury was instructed on self-defense, the trial court erred in excluding evidence that Tarver knew Demmons had shot a man over a woman, had shot at a motel, and was known to carry a gun. Tarver sought to introduce this evidence to show Tarver's state of mind at the time of the shooting and why he was in fear for his life.

"A trial court's decision whether to admit or exclude evidence is reviewed on appeal for an abuse of discretion." *State v. Brinkley*, 316 Ga. 689, 690 (889 SE2d 787) (2023) (citation and punctuation

___

[4] One of Tarver's friends testified that Tarver called him right after the shooting, and the friend then called 911 to report the shooting. Seven character witnesses also testified on Tarver's behalf, including his mother.

11

omitted). But if the trial court abuses its discretion in excluding evidence, we will reverse a conviction for a trial court's evidentiary error only if it was harmful. See *Morrell v. State*, 313 Ga. 247, 261 (2) (c) (869 SE2d 447) (2022) ("It is fundamental that harm as well as error must be shown for reversal."); OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). It is well-settled that the test "for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Jivens v. State*, 317 Ga. 859, 863 (2) (896 SE2d 516) (2023) (citation and punctuation omitted). See also *Truett v. State*, 311 Ga. 313, 318 (2) (857 SE2d 690) (2021).

Before trial, the State filed a motion to prohibit the defense from referring to Demmons's "reputation . . . for violence and/or specific acts of violence by [him]," and the trial court held a hearing on the motion on the first day of trial. At the hearing, the State argued that any character evidence regarding Demmons in the form of specific bad acts equated to propensity evidence under OCGA §§

12

24-4-404 and 24-4-405[5] and that to admit the evidence Tarver would be required to make a prima facie showing that he acted in self-defense by shooting Demmons, citing *Oliver v. State*, 329 Ga. App. 377, 381 (765 SE2d 706) (2014) (holding as "well established under Georgia law," and still in effect under the current Evidence Code, that before evidence of a victim's general reputation for violence or his specific acts of violence can be admitted, "the defendant must, among other procedural and substantive burdens, make a prima facie showing that the victim was the aggressor, that the victim assaulted the defendant, and that the defendant

---

[5] OCGA § 24-4-404 (b) provides:
Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
OCGA § 24-4-405 provides in relevant part:
(a) In all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion.
(b) In proceedings in which character or a trait of character of a person is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character, proof may also be made of specific instances of that person's conduct . . . .

13

responded with force only to defend himself or herself") (citation and punctuation omitted).[6] In response, Tarver's counsel indicated that he did not intend to present any evidence of specific offenses. Rather, he planned to present evidence as "to what my client knew, what my client knew of this person, and prior difficulties they had had together." After some further discussion, the trial court noted the parties' agreement to the admission of prior difficulties between Tarver and Demmons and granted the State's motion in limine as to evidence of Demmons's prior acts of violence involving third parties. However, during trial, Tarver's counsel argued that the State had opened the door to testimony about Demmons's bad acts by eliciting from Tarver on cross-examination that Demmons had called Tarver a "snitch," which counsel argued should permit Tarver to testify about the conduct about which Demmons thought Tarver had

---

[6] Some members of the Court are doubtful that this prima facie requirement was carried over to the current Evidence Code. However, we need not address this issue given that we assume error on this ground and conclude that any error was harmless.

snitched.[7] After reviewing the record, the trial court found that the State had not "opened the door" to more specific evidence and denied the objection.

In his motion for new trial, Tarver contested the trial court's decision to exclude evidence of his knowledge of Demmons's prior violent acts toward third parties. At the motion for new trial hearing, Tarver testified that on the day of the shooting, he was aware that Demmons "had just shot a motel up" and he "just shot a guy over a lady," without further detail. Tarver said that those were recent events at the time of the shooting, and his awareness of these events influenced his actions. Tarver said it made him "feel like, you know, that he would have shot me, too, because he was known for toting a gun." The trial court denied Tarver's motion on this ground, finding that the minimal probative value of the evidence was outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under OCGA § 24-4-403.

---

[7] The record is unclear as to the particular acts as to which Tarver contended the State opened the door.

15

Even assuming, without deciding, that the trial court erred in excluding this evidence at trial and that Tarver preserved this error for ordinary appellate review, any such error was harmless. Tarver's counsel was allowed to elicit extensive evidence as to why Tarver felt threatened by Demmons on the day of the shooting. Tarver testified that in the incident several months prior to the shooting, Demmons accused Tarver of telling the police something that got Demmons "locked up" for a "prior situation." Tarver said that from the language Demmons used in making those accusations, he believed that Demmons wanted to hurt him. Tarver further testified that on the day of the shooting, Demmons asked Tarver why he wanted to challenge him when Tarver knew that Demmons was "chain gang bound." Tarver testified that he believed this statement meant that Demmons wanted to hurt him and that Demmons did not care about the consequences because he had already been to prison. Additionally, Demmons had a 100-pound weight advantage over Tarver, and Tarver said he believed that Demmons knew that Tarver's injuries put him at a disadvantage after Demmons said

16

that he did not need a gun to beat Tarver. Also, Tucker and Williams each testified to hearing Demmons threatening Tarver just before the shooting. Therefore, evidence that Tarver was aware that Demmons had shot another man over a woman, "shot a motel up," and was known to carry a gun added little to Tarver's testimony about his prior difficulties with Demmons and evidence of Demmons's threats on the day of the shooting. See *Cook v. State*, 312 Ga. 299, 302 (2) (862 SE2d 510) (2021) (any error in exclusion of three instances of violence by victim against third parties to show that defendant had reason to fear victim was harmless in light of other evidence at trial, including evidence showing victim's prior threats and violence toward defendant); *Byers v. State*, 311 Ga. 259, 263 (1) (857 SE2d 447) (2021) (concluding that exclusion of testimony was harmless where it was essentially cumulative of other evidence); *Nix v. State*, 280 Ga. 141, 144-45 (5) (625 SE2d 746) (2006) (the trial court's error, if any, in excluding hearsay testimony of defendant's mother, was harmless where the excluded testimony was largely cumulative of other evidence introduced at trial).

Moreover, Tarver's claim of self-defense was weak since it depended solely on Tarver's self-serving testimony that Demmons came at him. In contrast, there was strong evidence undercutting his defense. After Tarver and Demmons had their initial verbal altercation earlier in the summer, Demmons did not further confront Tarver or take any threatening action against him. In fact, the two had no further contact until Tarver confronted Demmons on August 27, armed with a loaded weapon. Tarver testified that he loaded his gun at the car wash, though he usually kept his gun unloaded, because he knew Demmons was there. Moreover, Tarver acknowledged that when he confronted Demmons about the earlier incident, Demmons did not want to discuss the matter, but Tarver persisted, leading Demmons to tell him to "get out of [his] face." Tarver also admitted that Demmons never punched, pushed, or even touched him that day. And two eyewitnesses testified that Demmons was walking away from Tarver at the time Tarver shot him. This testimony was supported by evidence that Demmons was found face down after the shooting with ten gunshot wounds and had only one

wound to the front of his body, which expert testimony explained was a "complex wound" where the bullet could have gone in and out of the body. Additionally, Tarver continued shooting after Demmons was on the ground and no longer posed a threat.

Because the excluded evidence was largely cumulative and the evidence supporting a claim of self-defense was weak, we conclude that it is highly probable that the exclusion of the proffered evidence did not contribute to the verdict, and any error was harmless. See *Henderson v. State*, 310 Ga. 708, 714 (3) (854 SE2d 523) (2021) (trial court's exclusion of defendant's testimony about a victim's threat was harmless, in part because that testimony "added little if anything" to defendant's other testimony about "more explicit threats" from the victim and because "evidence of [defendant']s guilt was very strong"); *Beck v. State*, 310 Ga. 491, 497-99 (3) (852 SE2d 535) (2020) (concluding that it was highly probable that any error by the trial court in ruling that the defense could not introduce victim's prior acts of violence (except any involving the defendant) did not contribute to the verdict and was therefore harmless in light

19

of other evidence at trial); *Rowland v. State*, 306 Ga. 59, 67 (4) (829 SE2d 81) (2019) (given strong evidence of defendant's guilt and the marginal and cumulative value of the excluded evidence, it was highly probable that any error in its exclusion did not contribute to the verdict).

3. Tarver also asserts that the trial court abused its discretion in not allowing him to play his video-recorded interview with police because it was not hearsay as it was not being admitted for the truth of the matter asserted.[8] Tarver asserts that he sought to admit the video "to show the jury his tone of voice, the degree of emotion shown, his forthrightness rather than deflections and evasions when talking about the shooting." As with the prior enumeration, we review the trial court's denial of Tarver's request to play the video of his interview with police for an abuse of discretion, see *Brinkley*,

---

[8] To the extent that Tarver's reply brief addresses the trial court's ruling that the video-recorded interview was not admissible as a prior consistent statement, we do not consider such an argument because it was raised for the first time on appeal in a reply brief. See Supreme Court Rule 19 (3) ("Reply briefs may not be used to expand the enumeration of errors.").

316 Ga. at 690, and if we conclude that there is error, we then consider whether any error was harmful under the standard for non-constitutional errors. See *Morrell*, 313 Ga. at 261 (2) (c).

When Tarver announced his intention to testify, defense counsel indicated that he planned to play Tarver's recorded interview with police. The State moved in limine to exclude the recording on the grounds that it contained hearsay since it was being offered for the truth of the matters asserted, was not being offered by a party opponent, and would constitute improper bolstering. In response, Tarver's counsel argued that it was not improper hearsay because he wanted the jury to see that Tarver was being cooperative in the wake of the shooting and had nothing to hide then or at trial. After the trial court took a recess to give the defense an opportunity to research the issue, Tarver's counsel also asked that the recording be admitted as a past recorded recollection, which is not excluded by the hearsay rule even when the declarant is available as a witness. The trial court denied Tarver's request to admit the recording, finding it clear "that it would be self-serving and hearsay even under

the new rules." In its order denying the motion for new trial on this ground, the trial court reaffirmed its conclusion that the statements were self-serving hearsay.

Even assuming, without deciding, that the trial court abused its discretion in excluding the video-recorded interview for the purpose for which it was offered, any such error was harmless in light of the other evidence presented at trial that showed that Tarver was cooperative with police after the shooting. One police officer described Tarver as "cooperative as can be" and said that he told the officers where to locate his gun; another officer described Tarver as "very cooperative"; and a third police officer testified that Tarver told police where to find the gun, spoke with police willingly, volunteered to give up his clothes for a search without a warrant, and was "cooperative." Tucker also testified that Tarver did not try to run, but instead directed Tucker to call 911, called 911 himself, put the gun in his car, and waited for police. And Tarver also testified to the actions he took to cooperate with police. We conclude that evidence of Tarver's cooperation from the video-recorded police

interview would be largely cumulative of the other evidence presented at trial describing Tarver's interactions and cooperation with police, and therefore it is highly probable that the exclusion of the video did not contribute to the verdict. Accordingly, any error by the trial court was harmless.[9] See *Byers*, 311 Ga. at 263 (1); *Nix*, 280 Ga. at 144-45 (5).

*Judgment affirmed. All the Justices concur.*

---

[9] Tarver also enumerates as error that, to the extent that either of his first two enumerations of error was not properly preserved for appeal, he received ineffective assistance of counsel in failing to properly preserve the claim. Defense counsel acknowledged at oral argument that this was a "backup" claim in the event either of the other two issues were not preserved and that it appeared from the briefing that the parties agreed the issues were preserved. Because we have assumed that the first claim was preserved for ordinary appellate review and because the second claim was clearly preserved, we conclude that no claim for ineffective assistance of counsel on this ground can stand. Therefore, we need not address Tarver's third enumeration.

In addition, Tarver does not argue that the errors we have assumed and determined to be individually harmless nevertheless cumulatively resulted in harm. However, from our review of the record we discern no cumulative prejudice warranting reversal. See *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020) ("[E]ven in the evidentiary context, a defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").