313 Ga. 885
FINAL COPY

S22A0158.  PERKINS v. THE STATE.

WARREN, Justice.

Andreas Perkins was tried and convicted by a Fulton County jury of malice murder and other crimes in connection with the shooting death of Randy Menefee.[1]  Perkins raises four claims of

---

[1] Menefee was killed on January 26, 2014.  On May 2, 2014, a Fulton County grand jury issued a multiple-count indictment against Perkins and three other co-defendants: Jamal Chandler, Demario Franklin, and Jyquan Mitchell.  Perkins was charged with participation in criminal street gang activity (Count 1), malice murder (Count 2), three counts of felony murder (Counts 3-5, predicated on the crimes charged in Counts 8, 9, and 12), armed robbery (Count 8), aggravated assault of Menefee (Count 9), aggravated assault of Chekella Glover (Count 10), aggravated assault of Menefee's minor daughter (Count 11), burglary in the first degree (Count 12), cruelty to children in the first degree (Count 13), and possession of a firearm during the commission of a felony (Count 14).  Perkins and his co-defendants were tried twice jointly.  At the first trial, held in June 2016, the trial court granted Perkins and his co-defendants a directed verdict of acquittal on the gang count, and the other counts ended in a mistrial after a hung jury.  At the second trial, held in March 2017, the jury found Perkins and Chandler guilty of all the remaining counts and fully acquitted Franklin and Mitchell.  On April 7, 2017, the trial court sentenced Perkins to serve life in prison for malice murder, a consecutive 20 years for armed robbery, four 20-year terms for Counts 10-13, each to run consecutively to the armed-robbery count, and a 5-year concurrent term for possession of a firearm during the commission of a felony.  The other counts were merged or vacated by operation of law for sentencing purposes.

error on appeal: (1) the evidence presented at trial was insufficient to support his convictions for burglary and two counts of aggravated assault; (2) the trial court erred by denying Perkins's motion for mistrial after a witness improperly made a reference to gangs; (3) the trial court abused its discretion when it admitted five photographs that allegedly implied that Perkins was involved in gang activity; and (4) Perkins's trial lawyer was constitutionally ineffective when he failed to request certain jury instructions. Seeing no reversible error, we affirm.

1. The evidence presented at trial showed the following. Menefee and Chekella Glover were dating. Menefee lived with Glover at her apartment in the Allen Temple Court apartment complex, but he only slept there overnight "sometimes."[2] On the evening of January 26, 2014, Menefee was sleeping in Glover's

---

Perkins timely filed a motion for new trial on March 29, 2017, which he later amended through new counsel. After a hearing, the trial court denied the motion as amended on June 10, 2021. Perkins filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2021 and was orally argued on January 19, 2022.

[2] When asked at trial, both Menefee's sister and Menefee's daughter, J. R., agreed that Menefee was "living" at the Allen Temple Court apartments.

2

apartment while Glover and J. R., Menefee's daughter, were sitting on the sofa watching television. Menefee's other daughter, A. R., was in an apartment below, having her hair braided. At one point, Glover said that she thought that A. R. was "coming up because her hair was almost . . . finished," and J. R. heard "three light knocks" on the door. When Glover opened the door, however, four armed men wearing masks came in, with one of the men putting a gun in her face and backing her into the apartment as the group demanded money.

According to J. R., who was 11 years old at the time of the crimes and later testified at trial, the four men were wearing "all black," "had masks on," and carried guns, and one of the men had dreadlocks that stretched "[a]lmost down the back." One of the men pointed a gun in J. R.'s face and demanded to know "where the money at." As Menefee woke up, Glover called out to him and told him to "[j]ust give them the money." Menefee agreed, and Glover "ran to the drawer and got some money. She got a whole bunch of stuff. She picked up a lot of stuff and gave it to them." After the

3

men "took the money, they shot [Menefee] in the chest and in the shoulder and while he fell, he grabbed a pillow . . . and he got flipped over somehow." The men then left the apartment, and J. R. heard "a lot of gunshots as they were going out the door."

Glover's description of the crimes was similar to J. R.'s. She testified that she heard a knock at the door and thought it was A. R.—but when she opened the door, four armed men came in "demanding money." One of the men wore Timberland boots. Glover was afraid for her life because a gun was "in [her] face." At that point, Menefee woke up and told Glover to "give them the money out [of] the drawer," so Glover took cash from the drawer in the kitchen and gave it to the men. The men then started "going out the door and as they went out the door, they started shooting." And "[w]hen they went out the door, the last person turned around like slanted as he was going out the door and started shooting inside the apartment and that's when—when the door closed, they was still shooting in the hallway." Glover further testified that Menefee made money by selling drugs, that he sold the drugs from the

apartment, and that he typically kept $3,000 to $4,000 on his person. In the kitchen was a "glass pot that [Menefee] used to cook [ ] cocaine."

After the men left, J. R. went downstairs to find her sister. When J. R. came back upstairs, she saw two unmasked men inside Glover's apartment who appeared to be the "guys [who] were in the [apartment] shooting" minutes earlier. J. R. said they "looked kind of familiar" because of "[t]he dreads, the hat that was in there, the skull hat that they came back with, the dark-skinned dude came back with, the black one, that looked familiar."[3]   Glover recognized the two men as Perkins and Jamal Chandler, with whom she was acquainted.  In that regard, Glover testified that, several minutes after the masked men left her apartment, she opened the door "outside to get help" and saw Perkins and Chandler on her "porch" or "patio," with Perkins wearing Timberland boots.  Glover thought it was "odd" for them to be there because there "was always shooting

_____

[3] It is undisputed that Perkins had dreadlocks at the time the crimes were committed.

5

in the apartments so how they know that the shooting came from my apartment?"  Perkins and Chandler came inside and told Glover to "get the kids out" and "[g]et the stuff out" and that they were "going to see about [Menefee]."

According to J. R., both men had guns and one of the men had an "AK" or a "big gun" with a "strap around the shoulder."  The men were "just walking around trying to get stuff out the house," and they took Menefee's "[g]uns and money out [of a] drawer."  The men also asked repeatedly, "What happened to [Menefee]," and they asked J. R. "where [Menefee's] personal stuff was, his gun and the weed and stuff."  When J. R. responded that she did not know, the men told her to "go back downstairs," and she did.  During that time, Menefee was lying on the floor, "coughing up blood" and "trying to say something."

A. R. testified that, when she came upstairs to Glover's apartment after the shooting, she saw Menefee "on the floor with a pillow over his chest," "trying to breathe."  She also saw two men "coming in and out taking stuff out the house . . . [l]ike I guess bowls

6

and stuff. Like spoons, stuff like that. Just stuff out the kitchen." A. R. testified that the two men were not trying to help Menefee and that they told her and J. R. to leave the room. One of the men had "pretty long" dreadlocks, "like probably back like past his shoulders."

Menefee died by the time the police arrived on the scene. An autopsy revealed that he suffered a gunshot wound to his arm and a fatal gunshot wound to his chest. A bullet was recovered from Menefee's body that a firearms examiner with the Georgia Bureau of Investigation later testified was consistent with having been fired from a revolver. Police officers found numerous shell casings and bullets inside the apartment that had been fired from at least three different firearms. At trial, a firearm and ballistics expert testified that none of the shell casings were consistent "with an assault-style rifle such as an AK."

Menefee's sister, Twanesa Broughton, was alerted to the shooting shortly after it happened and drove to the scene. On arrival, she saw "a lot of people out, police, ambulance." Broughton

7

testified that Chandler came up to her and "started telling [her] how he held [Menefee] and watched him take his last breath." Broughton did not observe any blood on Chandler, but noted that he "had on all black that night." Broughton saw Perkins, Demario Franklin, and another co-defendant at Menefee's funeral, which occurred a week after the shooting.

Taliah Knox, who was acquainted with Perkins and the other co-defendants, as well as with Menefee, testified that earlier on the day of the crimes, she overheard Perkins, Chandler, Franklin, and at least one other man talking "about a possible robbery that was supposed to go on." Knox testified: "I can't recall everything but it was like it needs to happen and then from there it was, like, how it was going to be planned out or whatever." Later that night, Knox was conducting a "marijuana transaction" near the side of the building where Glover lived when she "heard gunshots" and "noises and stuff and . . . a conversation where it was, like, well, is he dead or you think he dead or whatever." She then saw "four males running, ski masks on. One had dreads on the ski mask, the other

8

one no hair.  They were running and one jumped over the . . . back gate in the back and the other ones was running . . . like toward the car." Asked what the men were wearing, Knox testified that she saw "Timberland boots, a pair of Air Max [shoes], pants, dark colored pants." She also saw the men take off their "ski masks," revealing them to be "Franklin, Jamal [Chandler], Andreas [Perkins], and the other guy with the Air Max." She saw the men carrying "a 9-millimeter" and a "big gun," which she also described as an "assault rifle."

Knox heard Chandler "cussing" and saying, in reference to Menefee, "f**k that n***a." Knox also heard "all" of the men discussing that "the daughter may have seen it.  It wasn't—this s**t wasn't supposed to go down like that and what the hell they gone do." Later, during an interview with Detective Summer Benton, Knox identified Perkins and the other three co-defendants in a photographic lineup.[4]

---

[4] Knox was not asked to make an in-court identification.

At trial, Detective Benton testified about other evidence that implicated Perkins and his co-defendants in Menefee's death. Among other things, Detective Benton had interviewed Rayonda Wynn, who had dated Chandler.[5] Wynn was with Perkins and Chandler when they found out that Franklin had been arrested for Menefee's murder. Wynn told Detective Benton that Perkins and Chandler "were extremely upset that Mr. Franklin was going to snitch on them and their involvement in this case." Wynn also told Detective Benton that Chandler and Menefee "were not close and that Mr. Chandler did not like Mr. Menefee at all and when [Wynn] was told that [Chandler] was helping out [with matters after Menefee's death], she immediately thought that he was involved in the homicide."

Detective Benton also interviewed Charmaine Turner, who was braiding A. R.'s hair on the night of the murder. During that

---

[5] Wynn testified at trial, but after she repeatedly responded "I don't remember" about what she said to Detective Benton during an earlier interview, portions of her recorded interview with Detective Benton were played for the jury.

interview, a recording of which was played for the jury,[6] Turner said that she heard four or five gunshots that night, and shortly afterward, she looked through the window and saw Perkins and Chandler running, with Chandler holding a handgun and Perkins holding a "big gun" that looked like a "chopper." Turner identified Perkins and Chandler from photographic lineups during the investigation.

Perkins and Chandler, who ultimately elected not to testify at trial, each gave voluntary statements to Detective Benton upon their arrests about two weeks after the crimes and after being given *Miranda* warnings.[7] Both men denied participating in the burglary of Glover's apartment and the shooting of Menefee, but both admitted entering Glover's apartment shortly after the crimes in the apartment took place.

---

[6] The audio recording of Turner's interview was played for the jury, without objection, after she testified that she could not recall several statements she made.

[7] See *Miranda v. Arizona*, 384 U.S. 436, 471 (86 SCt 1602, 16 LE2d 694) (1966).

11

Among other things, Perkins told Detective Benton that

> after he heard the shooting, he ran down to Mr. Menefee's home but before he got all the way there, he went to another apartment, grabbed a shotgun, came back, realized the police were probably on the way, then ran back to that apartment, put the shotgun up and then came back into the apartment . . . , and then kneeled down next to [Menefee] and held him . . . and then the police arrived.

Perkins said he was wearing "white jeans or white pants, a black top and tan Timberland boots" that night and that "no one was in the apartment with him when Mr. Menefee died."

For his part, Chandler told Detective Benton that Menefee was "like another brother to him," that he was "holding" Menefee as he was bleeding, and that "he was the one holding Mr. Menefee and no one else was in the apartment when Mr. Menefee died."[8]  Detective Benton testified that she found this discrepancy "[e]xtremely odd."

At trial, Perkins did not present any defense witnesses.  But during the cross-examinations of then-14-year-old J. R. and of Glover, Perkins's lawyer and some of the counsel for Perkins's co-

_____

[8] However, both Perkins and Chandler told Detective Benton that they "didn't have a drop" of Menefee's blood on them.

defendants tried to establish that Glover purposefully let the four men inside the apartment the night Menefee was killed. In this vein, J. R. testified on cross-examination about three "odd" events that happened earlier on the day of the crimes. First, she went for a walk with Glover and Glover's son, during which they encountered "a man with dreads" who was called "Chinese." That man "threw a thumbs up at [Glover] and then ran over there and said hey," which J. R. thought was "kind of odd." Second, Glover "was on the phone all night and she was telling her friend . . . something about some cake or something like that. They were going to pick up some cake. She told her to jump over the gate." Third, a person with "dreads" came to the apartment to buy marijuana, which J. R. thought was "odd" because "when he came in, he was counting heads. It was like he was counting heads. He was looking around at everybody." J. R. testified that this man "looked kind of like [Perkins]," but that she was not certain about his identity.

J. R. further testified that, before Menefee went to sleep on the night of the crimes, he said "not to answer the door for anyone" and

13

that Glover was "in a position to hear [him] say that." Finally, Glover admitted on cross-examination that the apartment door had a peephole; that, before Menefee fell asleep, he told Glover not to answer his phone; and that generally speaking, people would not be granted entry into the apartment unless they had called Menefee first. Glover could not recall whether Menefee said anything about answering the door.

2. Perkins contends that the evidence was insufficient to sustain his convictions on Count 10 (aggravated assault of Glover), Count 11 (aggravated assault of J. R.), and Count 12 (burglary in the first degree). For the reasons explained below, this enumeration of error fails.

(a)   With regard to the aggravated assault counts, Perkins argues that the State failed to present evidence sufficient to prove the allegations as charged in the indictment. He specifically contends that each of the two counts at issue (Counts 10 and 11) charged that Perkins committed the aggravated assaults "by shooting at, toward, and in the direction of" the victims. But

14

according to Perkins, "no witness testified that Perkins actually possessed a handgun," and the evidence presented at trial did not show that the armed intruders fired "at, toward, and in the direction of" either J. R. or Glover.[9]

When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979)). We leave to the jury "the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020).

Here, the jury was authorized to infer that the four armed men

---

[9] Perkins characterizes this enumeration as a "fatal variance" between the indictment and the proof at trial, but the argument he makes on appeal is essentially about the sufficiency of the evidence.

15

who burglarized Glover's apartment and shot Menefee fired "at, toward, and in the direction of" Glover and J. R. On that point, Glover testified that when she retrieved cash from the kitchen drawer and gave it to the men, "they start[ed] going out the door and as they went out the door, they started shooting." She also testified that, "[w]hen they went out the door, the last person turned around like slanted as he was going out the door and started shooting inside the apartment." Likewise, J. R. testified that she heard "a lot of gunshots as [the men] were going out the door." According to both J. R. and Glover, J. R. was in the living room when her father was shot and killed, and Glover was in either the living room or the kitchen. Photographs and a diagram of the apartment that were admitted as evidence at trial show that the apartment was small, that the living room and kitchen were connected, and that the door through which the armed men left opened directly into the living room. Viewed in the light most favorable to the verdicts, a jury reasonably could infer from this evidence that—at the least—as the armed men fled after burglarizing Glover's apartment and shooting

16

Menefee, they shot from the doorway or outside the apartment toward or into the apartment where J. R. and Glover remained.

Moreover, the jury was authorized to conclude that Perkins was part of the group of men who shot at or toward J. R. and Glover. To that end, the State presented evidence that Perkins and his co-defendants were discussing plans to commit a robbery hours before the crimes; that after the crimes, the same four men were seen running out of Glover's apartment building, carrying firearms, taking off ski masks, and discussing the crimes; that Perkins and Chandler re-entered Glover's apartment shortly after Menefee's shooting under the guise of providing assistance; and that Knox and Turner positively identified Perkins from photographic lineups as one of the four men who committed the crimes. The jury was therefore authorized to conclude that Perkins was at least a party to the crime of the aggravated assaults of J. R. and Glover. See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."). See also *Broxton v. State*, 306 Ga. 127,

17

136-137 (829 SE2d 333) (2019) (holding that the evidence was sufficient to support defendant's convictions, including as a party to a crime, as one of four gunmen who shot victims).

(b) Perkins contends that the evidence was not sufficient with respect to his conviction for first-degree burglary because the State did not establish that Glover's apartment was also Menefee's "dwelling," as charged in the indictment. See OCGA § 16-7-1 (b) ("A person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant dwelling house of another . . . .").[10]  We disagree.

At trial, evidence was presented that on the night of the crimes, Menefee was sleeping over at Glover's apartment while his minor daughters were also there visiting. Multiple witnesses—including Menefee's sister and his daughter—confirmed that Menefee was

---

[10] Count 12 of the indictment alleged, in relevant part, that Perkins and his co-defendants committed burglary in the first degree when they, "on the 26th day of January, 2014, did without authority and with intent to commit a theft therein, enter the dwelling house of Randy Jerome Menefee."

18

"living" in Glover's apartment. And even though other evidence was presented that Menefee only slept over at Glover's apartment "sometimes," the jury was authorized to infer that Glover's apartment nonetheless constituted Menefee's "dwelling." See OCGA § 16-7-1 (a) (1) ("'Dwelling' means any building, structure, or portion thereof which is designed or intended for occupancy for residential use."). See also *Murphy v. State*, 238 Ga. 725, 728-729 (234 SE2d 911) (1977) (noting that "'[o]wnership' . . . is not an essential ingredient to proving that the premises entered were 'the dwelling house of another' within the meaning of our burglary law," and holding that the victim's testimony "that she lived with her parents, that her father was R.M., and that she was at his home when the crimes occurred . . . adequately established that the premises entered by defendant were the 'dwelling of R.L.M.' as charged in the [burglary count of the] indictment"); *Frazier v. State*, 352 Ga. App. 98, 101 (834 SE2d 107) (2019) (evidence that a victim "stayed in [a] camper for two or three days at a time during deer-hunting season, six or seven times a year" and that he "kept mattresses, lights, . . .

19

and other camping and hunting supplies in the camper" sufficient to support the "dwelling" aspect of a burglary conviction).[11]

Perkins also contends that the State failed to prove the "without authority" element of first-degree burglary because Glover opened the door for the men who then burglarized her apartment and killed Menefee, and because there was "no evidence that Glover refused to open the door or first asked the men to reveal their identities." This argument fails because J. R. testified that Menefee told her "not to answer the door for anyone" that night, and both J. R.'s and Glover's testimony indicated that Glover opened the door to the gunmen unwittingly, thinking that J. R.'s sister, A. R., was returning from having her hair braided downstairs—not that four armed men would barge into the apartment. Under these

---

[11] Perkins cites a handful of Court of Appeals cases to support his argument that the State failed to prove that Glover's apartment constituted Menefee's "dwelling," as alleged in the indictment. But none of those cases are availing: one rejected a similar argument, see *Edward v. State*, 261 Ga. App. 57, 58 (581 SE2d 691) (2003); one held that a house under construction satisfied the requirements of the burglary statute, see *Sanders v. State*, 293 Ga. App. 534, 537 (667 SE2d 396) (2008); and another held that a house that was occasionally occupied by the victim constituted his "dwelling house," see *Earnest v. State*, 216 Ga. App. 271, 271-272 (453 SE2d 818) (1995).

20

circumstances, reasonable jurors could infer that Glover did not authorize four masked, armed men to enter her apartment. See *Thomas v. State*, 292 Ga. 429, 431-432 (738 SE2d 571) (2013) (in rejecting appellant's claim that the State did not prove the "without authority" requirement of a burglary charge, noting that "merely opening one's front door in response to a knock is not, ipso facto, an invitation to the visitors to come into one's home—particularly to strangers who come knocking in the middle of the night"—and affirming the burglary conviction). The State therefore presented sufficient evidence for a reasonable jury to conclude that Perkins entered Menefee's "dwelling" "without authority," and that he was guilty beyond a reasonable doubt of the first-degree burglary charge of which he was convicted. See *Jackson*, 443 U.S. at 319. In sum, the evidence presented at trial and outlined in part above was sufficient as a matter of constitutional due process for a rational trier of fact to have found Perkins guilty beyond a reasonable doubt of the aggravated assault and burglary counts of which he was convicted. See *Jackson*, 443 U.S. at 319; OCGA §§ 16-7-1; 16-5-21.

21

3. Perkins contends that the trial court erred when it denied his motion for mistrial after a witness impermissibly made a reference to a gang and when the trial court gave a curative instruction that repeated the word "gang."

As an initial matter, it is undisputed that the trial court had entered a pretrial order excluding all evidence of gang activity or affiliation in Perkins's second trial. However, during the direct examination of Menefee's sister, Broughton, the following exchange occurred:

> [PROSECUTOR]: At any point did you attempt to look up any information on Instagram for any information associated with this case?
> [BROUGHTON]: I did. In the beginning, like I said, it was a lot of vigils, a lot of stuff that we wasn't aware of, a lot of people and things were being said so we went on Instagram. I particularly went on Instagram and screen shot[t]ed items that referred to *the defendants being a part of a gang.*
> [PROSECUTOR]: Okay. Now, when you say screen shot[t]ed, what exactly are you referring to?
> [BROUGHTON]: It's when you go on and you can actually take a picture of a picture that's there.

(Emphasis supplied.) At that point, Chandler's attorney objected, and Perkins and his co-defendants collectively moved for a mistrial

22

on the ground that Broughton's "gang" reference violated the pretrial order.[12]

During the bench conferences that followed, the prosecutor agreed generally that the State was prohibited from introducing gang-related evidence, but insisted that Broughton's reference was "inadvertent." The prosecutor told the court that he had instructed Broughton not to discuss anything related to gang activity or to use the word "gang," and that his questioning "was not intended to elicit that answer," but rather was "intended to lay a foundation to get the social media evidence" admitted, showing that the co-defendants spent time together taking photographs that appeared to show them mourning Menefee's death. The trial court adjourned for the day and took the matter under advisement.

The next day, before the jury entered the courtroom, the trial

---

[12] Perkins contends that the trial court's denial of the motion for mistrial was particularly harmful because Broughton's reference to a gang was related to five photographs that were later admitted into evidence. According to Perkins, those photographs "showed the jury why Broughton thought the defendants were in a gang." But as we explain below in Division 4, we cannot say that those photographs—without more—conveyed signs of gang activity that would be obvious to a reasonable juror.

court asked the parties: "Are you ready to talk about the motion for mistrial? . . . I think the defense attorneys made a very timely objection. So timely that I think with a curative instruction, we can continue." The court stated its proposed curative instruction, which instructed the jurors not to "consider any evidence that the[ ] defendants are members of a gang or involved in gang activities." Before bringing the jury in to give them the proposed instruction, the court asked the parties for "any input." The defendants' attorneys were permitted to confer, and Chandler's counsel then responded, "we have discussed it. . . . [W]e feel that any curative instruction would be insufficient. It's a bell that cannot be unrung. It's inflammatory. Our position is simply [that] an instruction is insufficient."

When the jury was brought back into the courtroom, the trial court gave the following curative instruction, thus implicitly denying the defendants' motion for a mistrial:

> Ladies and gentlemen of the jury, yesterday the last question asked by the prosecutor of the witness on the witness stand was this: At any point did you attempt to

24

look up any information on Instagram for any information associated with this case. Her response was I did, which is the answer to the question. But then she went further and volunteered information that was nonresponsive to the question not asked by the prosecutor and it is: In the beginning like I said, it was a lot of vigils, a lot of stuff that we wasn't aware of, a lot of people and things being said so we went on Instagram. I particularly went on Instagram and screen shot[t]ed items that referred to the defendants being part of a gang. That was nonresponsive, not called for by the prosecutor's question. It was volunteered.

I charge you and instruct you that these defendants are not being prosecuted as members of a gang or any gang activity whatsoever. The Court on its own motion strikes the nonresponsive part of this witness's answer and therefore [it] is not evidence before you. I remind you that your oath that you took, you swore to make your decision based upon the evidence. That evidence is no longer evidence for you. You may not consider any evidence that the defendants are members of a gang or involved in gang activities from any evidence in this trial henceforth, including but not limited to the part that this witness's testimony said that I have labeled nonresponsive. You should in fact disabuse your minds of it completely. It should not be part of your discussions or deliberations or take any part in your decision making process. That being said, we may continue with the examination.

Neither Perkins nor his co-defendants renewed objections to the instruction or the motion for mistrial after the instruction was given, and the prosecutor continued examining Broughton about the

photographs she found on Instagram.[13]

"[T]he decision to grant a mistrial is within the discretion of the trial court and will not be disturbed on appeal unless there is a showing that a mistrial is essential to the preservation of the right to a fair trial." *Walker v. State*, 306 Ga. 44, 49 (829 SE2d 121) (2019) (citation and punctuation omitted). Pretermitting whether Perkins properly preserved this claim, we conclude that the trial court acted within its discretion to conclude that a mistrial was not necessary to preserve Perkins's right to a fair trial. The prosecutor had instructed Broughton not to make any reference to gangs; Broughton mentioned the word "gang" only once and did not mention Perkins's name in connection with that reference; and before the trial court allowed Broughton's testimony to continue, it instructed the jury to disregard the reference to a "gang." See *Wilkins v. State*, 308 Ga. 131, 137 (839 SE2d 525) (2020) (trial court did not abuse its discretion in denying mistrial where witness's

---

[13] Other than the five photographs Broughton identified from Instagram, Perkins does not allege that any other gang-related evidence was introduced at trial.

26

potentially inadmissible hearsay reference to the "murder weapon" was "a passing reference that was contrary to the directions given by the prosecutor; the statement did not link the weapon to Appellant; [and] the jury was promptly instructed to disregard the comment . . .").

Moreover, the trial court's curative instruction to the jury included a strong and clear admonition that "these defendants are not being prosecuted as members of a gang or any gang activity whatsoever" and that "[y]ou may not consider any evidence that the defendants are members of a gang or involved in gang activities from any evidence in this trial henceforth, including but not limited to the part that this witness's testimony said that I have labeled nonresponsive." The trial court concluded by instructing the jury, "[y]ou should in fact disabuse your minds of it completely."

It is well established that a trial court "can negate the potentially harmful effect of improperly introduced evidence by prompt curative instructions rather than by granting a mistrial." *Walker*, 306 Ga. at 49, and juries "are presumed to follow curative

27

instructions in the absence of proof to the contrary," *Rosser v. State*,

308 Ga. 597, 603 (842 SE2d 821) (2020) (citation and punctuation

omitted). Perkins does not argue that this presumption does not

apply here, but rather that Broughton's testimony "could only be

remedied by a mistrial" because the curative instruction itself

referenced the word "gang" four times. We disagree and conclude

that the trial court did not abuse its discretion by providing a

curative instruction that (among other things) acknowledged

Broughton's singular reference to a gang, informed the jury that the

court had stricken that aspect of Broughton's testimony as

nonresponsive, and made clear that the jury was not permitted to

"consider any evidence that the defendants are members of a gang

or involved in gang activities from any evidence in this trial." See

*Lee v. State*, 306 Ga. 663, 669 (832 SE2d 851) (2019) ("[A] trial court

acts within its discretion when it provides adequate curative

instructions to the jury to cure any prejudice stemming from the

introduction of improper evidence."). See also *Smith v. State*, 302

Ga. 699, 701-702 (808 SE2d 692) (2017) (holding that trial court's

"thorough curative instruction," mentioning "drugs" four times in instructing the jury that a witness's reference to drugs was to be disregarded, was "sufficient to counter any alleged harm caused by the witness's brief statement"); *Coleman v. State*, 301 Ga. 720, 722 (804 SE2d 24) (2017) (concluding there was "no error in the trial court's refusal to grant a mistrial," in part because the court gave a "lengthy curative instruction to the jury, telling the jurors that the [testimony in question] was inadmissible . . . and that they should disregard that evidence in its entirety, not hold it against [defendant] in any way, and not weigh it or consider it in any manner in [their] deliberations in this case") (punctuation omitted). Perkins's claim therefore fails.

4. Perkins contends that the trial court abused its discretion in admitting five photographs—State's Exhibits 87, 129, 167, 168 and 169—Broughton referenced in her testimony. It is undisputed that all of these exhibits are photographs taken at memorials or vigils that were held for Menefee several days after his death. The photographs Perkins objected to depicted the following: Exhibit 87

29

shows Chandler wearing pants labeled with "RIP" in red ink; Exhibit 129 shows Perkins holding a red candle while wearing a red undergarment that is visible and a red or maroon jacket and holding a rifle; Exhibit 167 shows Chandler wearing his "RIP" pants, Franklin wearing a red hat, making hand gestures, and smoking, and another man making a similar hand gesture and wearing red shoes and a hat with "SMM" on it; Exhibit 168 shows Franklin making hand gestures; and Exhibit 169 shows Franklin in Glover's apartment smoking, holding a red candle, and wearing red gloves. Perkins argues that the photographs were "highly prejudicial" and violated OCGA § 24-4-403 ("Rule 403") because the clothing worn by the men depicted in the photographs suggested a gang affiliation and the men could have been viewed as "making signs that could be construed as gang[-]affiliated."

"The admission of evidence lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." *Harris v. State*, 313 Ga. 225, 231 (869 SE2d 461) (2022) (citation and punctuation omitted). Under Rule

30

403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" "But as we have repeatedly explained: Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility." *Carston v. State*, 310 Ga. 797, 803 (854 SE2d 684) (2021) (citation and punctuation omitted). Therefore, when we review the Rule 403 balancing test, "we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact," id. (citation and punctuation omitted), and "the trial court's decision will not be disturbed unless there is a clear abuse of discretion," *West v. State*, 305 Ga. 467, 473 (826 SE2d 64) (2019) (citation and punctuation omitted).

At trial, and again in evaluating Perkins's motion for new trial, the trial court considered Perkins's arguments and the State's response that the colors and gestures were incidental and that testimony would not be, and was not, elicited about their meaning. In denying Perkins's motion for new trial, the trial court concluded

that the five photographs "were relevant to show multiple facts at issue at trial and . . . that their probative value was not substantially outweighed by a danger of unfair prejudice." It also found that all of "the pictures were intrinsic evidence and thus Rule 404 (b) [OCGA § 24-4-404 (b)] did not apply to it."

We see no abuse of discretion in the trial court's conclusion under Rule 403 that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. First, the only photograph that depicts Perkins is Exhibit 129, which shows him in possession of a rifle slung over his shoulder by a strap while holding a red candle. That image corroborated multiple witnesses who testified that they saw Perkins at or around the time of the crimes carrying a gun that they characterized as an "assault rifle," "AK," "chopper," or "big gun" with a "strap around the shoulder"—evidence that was indisputably probative of the State's case. Under these circumstances, the trial court did not abuse its discretion by concluding that the probative value of the photograph's depiction of Perkins holding a rifle was not substantially outweighed

32

by the danger of unfair prejudice.[14] See *Harris*, 313 Ga. at 232, 233 (no abuse of discretion in admitting social media posts, which included a photograph of a gun that defendant claimed to possess, because they were relevant and did not violate Rule 403); *Lyons v. State*, 309 Ga. 15, 23 (843 SE2d 825) (2020) (no abuse of discretion in admitting photograph from social media showing defendant in possession of a gun because it "was relevant to show that [he], at some point, possessed the type of gun used in the crimes at issue," and "[t]he probative value of this evidence was not substantially outweighed by its prejudice").

The other four photographs depicted only Perkins's co-

_____

[14] Moreover, to the extent Perkins complains that he was wearing some red clothing and holding a red candle in Exhibit 129, thus implying that he was affiliated with a gang, we cannot say that a reasonable juror would reach such a conclusion—especially given the curative instruction the trial court gave during Broughton's testimony, and given that the jury did not hear any evidence connecting any specific color to gang activity. Cf. *Jones v. State*, 310 Ga. 886, 890-891 (855 SE2d 573) (2021) (in evaluating whether trial counsel failed to present evidence of other peoples' gang membership, noting that "aside from testimony that some people at the gathering were flashing gang signals, the defense presented no evidence [at trial] that any of the attendees was a gang member" and "the State countered the defense's argument" that "several people seen in [a] video . . . and wearing red hoodies were members of the Bloods gang" with "evidence that the red clothing merely represented the colors of Cairo High School").

defendants. But even assuming, without deciding, that the trial court abused its discretion in admitting these photographs, any such error was harmless. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Cook v. State*, 312 Ga. 299, 302 (862 SE2d 510) (2021) (citation and punctuation omitted). And "[i]n determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Kirby v. State*, 304 Ga. 472, 478 (819 SE2d 468) (2018) (citation and punctuation omitted).

Here, as with Exhibit 129, we cannot say that a reasonable juror would discern solely from pants with "RIP" on them, a hat with "SMM" on it, hand gestures, or red items—aspects of the four photographs Perkins points to on appeal—as suggesting that he and his co-defendants were affiliated with a gang.[15] Indeed, the State made no argument at trial that the photographs depicted gang

_____

[15] Perkins argues on appeal that "SMM" stands for "Sex, Money, Murder," a division of the Bloods gang, and that the hand gestures depicted in the photographs are gang signs.

34

affiliation or activity. Neither has Perkins presented any evidence showing that the photographs depicted gang affiliation or activity. Moreover, as with Exhibit 129, the four other photographs were admitted into evidence shortly after the trial court instructed the jury not to "consider any evidence that the defendants are members of a gang or involved in gang activities from any evidence in this trial," which diminished any potential prejudicial effect of the photographs, and the State also presented strong independent evidence of Perkins's guilt apart from the photographs. See *Rosser*, 308 Ga. at 603 ("[J]uries are presumed to follow curative instructions in the absence of proof to the contrary."); *Lofton v. State*, 309 Ga. 349, 357 (846 SE2d 57) (2020) (admission of photographs showing defendant with handguns was harmless in part because the State "presented strong independent evidence of [the defendant's] guilt"). We thus conclude that it is highly probable that admission of the four photographs did not contribute to the verdicts against Perkins. See *Lofton*, 309 Ga. at 357-358. Cf. *Cushenberry v. State*, 300 Ga. 190, 197 (794 SE2d 165) (2016) (any error under the old

35

Evidence Code in admitting allegedly prejudicial comments made by other people about gang-related photographs obtained from social media was harmless because the comments were not made "by or directly related to [the defendant]" and therefore had little probative value or prejudicial effect).[16]

5. Perkins contends that he received constitutionally ineffective assistance when his trial counsel failed to request a pattern jury instruction on "witness leniency" and an instruction on accomplice corroboration. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2016) ("Pattern Instruction"),

---

[16] Perkins also contends that admission of all five photographs violated OCGA § 24-4-404 (b) ("Rule 404 (b)"), which generally prohibits "[e]vidence of other crimes, wrongs, or acts" to prove character but permits such evidence for "other purposes." As noted above, however, the trial court concluded that "the pictures were intrinsic evidence" that was not subject to Rule 404 (b), and we see no abuse of discretion in that ruling. See *Gialenios v. State*, 310 Ga. 869, 882 (855 SE2d 559) (2021) (no abuse of discretion in admitting as intrinsic evidence photographs related to defendant's conduct the days and weeks after the murder), disapproved on other grounds by *Outlaw v. State*, 311 Ga. 396 (858 SE2d 63) (2021). See also *Lofton*, 309 Ga. at 357 (noting that trial court properly admitted a social-media photograph posted "just hours before the shooting in which he was holding the handgun used to kill [the victim]" as intrinsic evidence).

§§ 1.31.80[17] and 1.31.92.[18]

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466

---

[17] Pattern Instruction § 1.31.80 provides:
In assessing the credibility of a witness, you may consider any possible motive in testifying, if shown. In that regard you are authorized to consider any possible pending prosecutions, negotiated pleas, grants of immunity or leniency, or similar matters. You alone shall decide the believability of the witnesses.

[18] Pattern Instruction § 1.31.92 provides:
The testimony of the accomplice alone is not sufficient to warrant a conviction. The accomplice's testimony must be supported by other evidence of some type, and that evidence must be such as would lead to the inference of the guilt of the accused independent of the testimony of the accomplice. . . .

U.S. at 687-688. This requires a defendant to overcome the "strong presumption" that trial counsel's performance was adequate. See *Strickland*, 466 U.S. at 689; *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015). To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a) Perkins's first claim centers on Knox's testimony during Perkins's first trial, when she testified that there was "no reason" she was near Glover's apartment on the night of Menefee's murder, in contrast to her testimony during the second trial that she was there to purchase marijuana.[19] Perkins now argues that his trial counsel was deficient because he did not request Pattern Instruction

---

[19] This admission came to light during Knox's cross-examination at Perkins's second trial when she admitted to "[l]ying about the marijuana."

§ 1.31.80 at the second trial.

To begin, Perkins has not established that Knox had any "pending prosecutions, negotiated pleas, grants of immunity or leniency, or similar matters" that would make Pattern Instruction § 1.31.80 applicable. But in any event, the trial court adequately covered the applicable law in the instructions it gave the jury on witness credibility and impeachment. See *Lee v. State*, 281 Ga. 776, 777-778 (642 SE2d 835) (2007) (the "possible motive, interest, or bias of the State's witnesses" was "adequately covered" by the instruction that the jury "was the arbiter of each witness's credibility and that it should give consideration to each witness's interest or lack thereof in the outcome of the case"). See also Note to Pattern Instruction § 1.31.80 (citing *Lee* and stating that Pattern Instruction § 1.31.80 is "[a]dequately covered by [a] general credibility charge"). In so doing, the trial court explained that the jury had the duty to determine witnesses' credibility and that it could consider all the facts and circumstances of the case—including the witnesses' "interest or lack of interest in the outcome of the case and their

39

personal credibility as [the jury] observe[d] it," "evidence offered to attack or cast doubt upon or challenge the credibility or believability of or cause [the jury] to disbelieve any such witnesses," and "any inconsistency in a witness's pretrial statements and testimony when compared to the same witness's trial testimony." As a result, Perkins has not established that he suffered prejudice from his trial counsel's failure to separately request Pattern Instruction § 1.31.80, and his claim fails. See *Stafford v. State*, 312 Ga. 811, 821 (865 SE2d 116) (2021) (holding that because jury was "properly and adequately instructed on proximate cause, . . . [a]n additional jury charge on unforeseen or intervening cause was unnecessary," and the defendant "ha[d] not shown prejudice from the lack of such a request" to support his claim of ineffective assistance of counsel).

(b) Perkins contends that his trial counsel performed deficiently because Glover could be considered Perkins's accomplice and Perkins's trial counsel should have requested Pattern Jury

Instruction § 1.31.92.[20]

The record shows that at the charge conference, the trial court—recognizing that none of the co-defendants had requested an accomplice-corroboration charge—asked the parties if they wanted the charge to be given. Perkins's trial counsel said nothing in response, and his co-defendants' attorneys responded that they did not think any accomplice testimony had been offered and did not believe an accomplice-corroboration charge was necessary. The trial court replied, "nobody requested it so I'm giving you an opportunity and you all agree that's not necessary." Neither Perkins's counsel, nor any of his co-defendants' counsel, responded further, and the trial court did not charge the jury on accomplice corroboration.

On appeal, Perkins makes little effort to explain how or why the evidence introduced at trial established that Glover could be

---

[20] This pattern instruction is based on OCGA § 24-14-8, which provides that "[t]he testimony of a single witness is generally sufficient to establish a fact. However, in . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness."

considered an accomplice in the crimes committed against her, her boyfriend, and his child in Glover's own apartment; he primarily points to his trial counsel's response at the hearing on Perkins's motion for new trial agreeing that there was "slight evidence" to support requesting an accomplice-corroboration charge at trial.[21] However, before he was asked to consider whether slight evidence supported such a charge, Perkins's trial counsel was asked if there was "any strategic reason for not requesting the accomplice corroboration instruction," and he responded that his "defense [theory] was built around sufficiency of the evidence." He further testified that he did not "believe that [the accomplice-corroboration] significantly help[ed] under the facts and circumstances of this case." On this record, where the evidence supporting an accomplice-corroboration charge was at best slight, we cannot say that it was

---

[21] Perkins implies that Glover was an accomplice based on evidence introduced at trial that included J. R.'s testimony that she observed what she characterized as an "odd" conversation between Glover and a man with a dreadlock hairstyle earlier on the day of Menefee's murder and evidence that Glover, without first looking through her apartment door's peephole, opened the door to four armed men despite Menefee's instructions earlier that night "not to answer the door for anyone."

objectively unreasonable for trial counsel to make that strategic choice about Perkins's defense theory. See *Manner v. State*, 302 Ga. 877, 884 (808 SE2d 681) (2017) (even where evidence sufficient to warrant accomplice-corroboration charge, "it was not objectively unreasonable for counsel to conclude that any benefit to [the defendant] in instructing the jury that [his accomplice's] testimony required corroboration was outweighed by the instruction's potential conflict with the theory of defense"). See also *Vasquez v. State*, 306 Ga. 216, 230 n.13 (830 SE2d 143) (2019) ("We have previously recognized that, in the context of a claim of ineffective assistance of counsel, it may be a reasonable trial strategy for the defense to forgo a request for an accomplice-corroboration charge even though it was warranted by the evidence presented at trial."). Perkins has not established that his trial counsel performed deficiently, so his claim of ineffective assistance fails.[22]

---

[22] Perkins also argues that the cumulative prejudice of the alleged trial-counsel deficiencies and trial-court errors entitle him to a new trial. See *State v. Lane*, 308 Ga. 10, 17-18 (838 SE2d 808) (2020). For purposes of a cumulative-error analysis, the assumed trial court evidentiary error is the

*Judgment affirmed. All the Justices concur.*

Decided May 17, 2022 — Reconsideration denied June 22, 2022.

Murder. Fulton Superior Court. Before Judge Dunaway.

*Matthew K. Winchester*, for appellant.

*Fani T. Willis, District Attorney, Lindsay H. Rudder, Kevin C. Armstrong, Elizabeth Rosenwasser, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Parisa F. Sarfarazi, Assistant Attorney General*, for appellee.

admission of four photographs, which we have already determined to be harmless, and the assumed deficient performance of counsel is failing to request Pattern Instruction § 1.31.80, which we have already determined did not prejudice Perkins. We have considered the cumulative effect of this presumed evidentiary error and presumed deficient performance of counsel together and conclude that their collective effect is not sufficiently harmful to outweigh the strength of the properly admitted evidence of Perkins's guilt so as to warrant a new trial. See *Lofton*, 309 Ga. at 366-367; *Lyons*, 309 Ga. at 26.